In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-2476

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

AZUREEIAH O'CONNOR,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 CR 672-5—**Elaine E. Bucklo**, *Judge.*

ARGUED APRIL 7, 2010—DECIDED SEPTEMBER 1, 2011

Before WOOD, EVANS[*], and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Azureeiah O'Connor was convicted by a jury of wire fraud and appeals her conviction on multiple grounds. She focuses first on the 1,229-day delay between the date the last of her codefendants

[*] Circuit Judge Terence T. Evans died on August 10, 2011, and did not participate in the decision of this case, which is being resolved by a quorum of the panel under 28 U.S.C. § 46(d).

was arraigned and the start of her trial, a delay that she contends violated the Speedy Trial Act (the "Act"), 18 U.S.C. §§ 3161 *et seq.*, and her right to a speedy trial under the Sixth Amendment. She also challenges the jury instructions, the sufficiency of the evidence to sustain her conviction, and the form of the indictment that went to the jury.

The Speedy Trial Act claim is the main event. The Act generally requires that trials commence within 70 days of a defendant's arraignment or indictment (whichever is later), but also permits district courts to exclude certain periods of time from this 70-day clock. *See id.* § 3161(h)(7). In a series of continuances, the district court excluded all 1,229 days and later denied O'Connor's motion to dismiss on Speedy Trial Act grounds. On appeal O'Connor challenges many of the court's exclusions, but review of some of the claimed violations is hampered by her failure to raise them in the district court. To preserve an alleged Speedy Trial Act violation for appeal, the Act requires the defendant to move to dismiss prior to trial and generally (with one exception) places the burden on the defendant to prove the violation. Any violation not preserved by a motion to dismiss is waived. *Id.* § 3162(a)(2).

O'Connor's motion to dismiss challenged just one of the court's continuances; on appeal she advances several *additional* violations that she did not identify below. Her failure to specifically identify the additional violations in her motion may preclude appellate review under the Act's waiver provision; at the very least, it is

a forfeiture, and review would be limited to the plain-error standard. Either way, O'Connor cannot prevail. Although the government concedes that one exclusion of time—for 42 days—was improper, that error alone doesn't put O'Connor's trial outside the statute's 70-day limit. As to the other claimed violations, O'Connor has not established that the continuances amounted to error, let alone plain error.

One particular challenge, however, relates to an intervening change in the law and deserves special mention. O'Connor argues that the court improperly excluded two time periods attributable to preparation of pretrial motions without making the findings required under § 3161(h)(7), the provision that broadly authorizes the court to exclude time from the speedy-trial clock based on the "ends of justice." *See Bloate v. United States*, 130 S. Ct. 1345, 1357-58 (2010). Under circuit precedent then in effect, these delays were automatically excludable under a different provision of the Act authorizing the exclusion of time for "delay resulting from any pretrial motion." *See* 18 U.S.C. § 3161(h)(1)(D); *United States v. Tibboel*, 753 F.2d 608, 610 (7th Cir. 1985). But the Supreme Court's decision in *Bloate* displaced *Tibboel* and applies to cases (like O'Connor's) pending on direct review. *See United States v. Townsend*, 419 F.3d 663, 665 (7th Cir. 2005). Because O'Connor failed to identify these particular violations in her motion to dismiss, our review is (at most) for plain error. As to the first of these continuances, we find no error at all; the court made sufficient findings to satisfy § 3161(h)(7) and *Bloate*. As to the

second, the continuance was for only 11 days and did not put the total over the 70-day statutory limit.

We also reject O'Connor's Sixth Amendment speedy-trial claim, as well as her challenges to the jury instructions, the sufficiency of the evidence, and the form of the indictment that went to the jury room. We therefore affirm O'Connor's conviction.

## I. Background

On July 25, 2005, O'Connor and eight codefendants were charged in a 13-count indictment with mail fraud, wire fraud, and filing false loan applications in violation of 18 U.S.C. §§ 1341, 1343, and 1014. The indictment alleged that O'Connor participated in a mortgage-fraud scheme masterminded by her codefendant Shaun Cross. O'Connor, who worked as a mortgage-loan officer and helped to facilitate the fraud, was charged with two counts of wire fraud as an aider and abettor in violation of 18 U.S.C. §§ 1343 and 2.

O'Connor's trial did not begin until January 2009, three and a half years after her indictment. The complexity of the case, scheduling problems, guilty pleas by O'Connor's codefendants, and other contingencies led to a series of continuances in which the court excluded all time from August 22, 2005—the day O'Connor's speedy-trial clock began to run—until January 5, 2009,

the day O'Connor's trial began.[1] Much of the delay was attributable to guilty-plea proceedings involving her codefendants; most pleaded guilty between 2006 and early 2008, and the final codefendant pleaded guilty on March 6, 2008. After these guilty pleas, the government dismissed one of the wire-fraud counts against O'Connor. Thus, what began as a nine-defendant, thirteen-count mortgage-fraud prosecution was whittled down to a single-defendant, one-count case for trial.

On the eve of trial, O'Connor filed a motion to dismiss based on the Speedy Trial Act. Her motion challenged only one of the court's exclusions of time: The judge's decision to reset the trial date from September 4, 2008, to January 5, 2009, "in the interest of justice for trial preparation" under 18 U.S.C. § 3161(h)(7). Just before starting jury selection, the court denied O'Connor's motion, clarifying that this continuance was actually granted under § 3161(h)(3)(A) based on the unavailability of an essential government witness and was not an "ends of justice" continuance under § 3161(h)(7).

Trial began on January 5 and lasted four days. The government's evidence provided a detailed account of a sustained fraudulent scheme spanning more than two

---

[1] In a case involving more than one defendant, "the speedy trial clock for all defendants typically does not begin to run until the last of the defendants appears." *United States v. Adams*, 625 F.3d 371, 377 (7th Cir. 2010). The last of O'Connor's codefendants was arraigned on August 22, 2005.

years, from September 2000 to January 2003, and organized by Cross, a mortgage broker. The fraud involved more than $6 million in mortgage loans in 35 transactions on 17 residential properties using the names of 17 different straw buyers. The loans were provided by 23 banks and residential lenders, and Cross paid the straw buyers $5,000 for the use of their names and Social Security numbers. Some straw buyers also signed the fraudulent mortgage-loan documents. Cross told the straw buyers that he would repurchase the homes within a few months and make the mortgage payments in the interim. After each transaction closed, Cross received the mortgage funds through title-insurance companies that he owned, kept the money, and did not make the mortgage payments. He also used the straw buyers' identities to fraudulently obtain additional mortgages. The other defendants, including O'Connor, acted as "recruiters" who enlisted straw buyers to falsely put mortgages in their names.

At the time the fraudulent scheme was carried out, O'Connor worked as a loan officer at Express Mortgage Company and Home First Mortgage Company, licensed mortgage brokers. The evidence established that she processed seven fraudulent loan packages and forwarded them on to lenders for funding with knowledge that the identities of the buyers in the loan packages were false and that Cross was the real purchaser. The loans were eventually placed in default. In exchange for her assistance, O'Connor received roughly $20,000 in kickbacks from Cross.

The jury convicted O'Connor of one count of wire fraud, and she was sentenced to 50 months' imprisonment. Cross, the mastermind of the mortgage-fraud scheme, received the longest sentence of any of the codefendants— 140 months. *See United States v. Cross*, 273 F. App'x 557 (7th Cir. 2008). This appeal followed.

## II. Discussion

### A. Speedy Trial Act

The primary issue on appeal is O'Connor's challenge to the district court's denial of her motion to dismiss under the Speedy Trial Act. Our review is generally de novo, *United States v. Napadow*, 596 F.3d 398, 402 (7th Cir. 2010), but factual findings are reviewed for clear error, *United States v. King*, 338 F.3d 794, 797 (7th Cir. 2003).

The Act requires criminal trials to begin within 70 days of the indictment or the defendant's initial appearance, whichever occurs later. 18 U.S.C. § 3161(c)(1). Where, as here, the defendant is jointly charged with code-fendants, the speedy-trial clock starts when the last codefendant is indicted or arraigned, so long as the intervening delay is "reasonable." *Id.* § 3161(h)(6). If the defendant is not brought to trial within the 70 days specified in the Act, "the information or indictment shall be dismissed on motion of the defendant." *Id.* § 3162(a)(2). The Act recognizes, however, that certain delays are justifiable and permits these periods of time to be excluded from the 70-day clock. *Id.* § 3161(h); *see also Bloate*, 130 S. Ct. at 1351-52; *Napadow*, 596 F.3d at 402.

Two provisions of the Act are particularly relevant to this appeal. The first is known as the "ends of justice" provision, which permits the court to exclude delays resulting from continuances granted "on the basis of [the judge's] findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(7)(A).[2] The Act outlines several factors the trial judge should consider in determining whether to grant an ends-of-justice continuance, including "[w]hether the failure to grant such a continuance . . . would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation . . . ." *Id.* § 3161(h)(7)(B)(iv). The statute requires the court to "se[t] forth, in the record of the case, either orally or in writing, its reasons" for granting an ends-of-justice continuance. *Id.* § 3161(h)(7)(A). The Supreme Court has determined that "the Act is ambiguous on precisely when [the required] findings must be 'se[t] forth[] in the record of the case.'" *Zedner v. United States*, 547 U.S. 489, 507 (2006). But *Zedner* held that "at the very least the Act implies" that the district court must enter the

---

[2] The Act was amended in 2008, and the ends-of-justice subsection was renumbered from § 3161(h)(8) to § 3161(h)(7). Most of the district court's minute orders reference subsection (h)(8), but because this amendment was not substantive, we refer to the ends-of-justice subsection as (h)(7).

findings into the record *not later than* the time the court rules on a defendant's motion to dismiss. *Id.*

The other Speedy Trial Act provision relevant here, which the district court invoked to justify the continuance O'Connor specifically challenged in her motion to dismiss, permits the exclusion of "[a]ny period of delay resulting from the absence or unavailability of . . . an essential witness." 18 U.S.C. § 3161(h)(3)(A). When the unavailable witness will testify for the government, the government bears the burden of justifying the exclusion of time. *Id.* § 3162(a)(2).

O'Connor's 70-day speedy-trial clock started on August 22, 2005, the day the last of her codefendants was arraigned. Trial began on January 5, 2009, a delay of 1,229 days. Although the court excluded all 1,229 days, the government concedes—and we agree—that the district court erred by excluding 42 days from May 19, 2008, to July 1, 2008. This delay was attributable to the court's scheduling problems, and the Act explicitly prohibits the court from excluding time based on "general congestion of the court's calendar." *Id.* § 3161(h)(7)(C). (We will have more to say about this error later.) O'Connor's argument therefore implicates the 28 days remaining on the speedy-trial clock. Before addressing the merits, however, we confront a threshold procedural question—whether the continuances O'Connor challenges on appeal were properly preserved for review.

### 1. *Waiver or Forfeiture?*

The Speedy Trial Act provides that if a defendant is not brought to trial within the 70-day limit, "the information or indictment shall be dismissed on motion of the defendant," but the "[f]ailure of the defendant to move for dismissal [of the indictment] prior to trial . . . shall constitute a waiver of the right to dismissal." *Id.* § 3162(a)(2). Although the plain-error standard generally governs appellate review of issues not raised in the district court, *see* FED. R. CRIM. P. 52(b), the Act is clear that "a defendant's failure to move to dismiss the indictment constitutes a waiver—not a forfeiture—of his rights under the Act," *United States v. Morgan*, 384 F.3d 439, 443 (7th Cir. 2004); *see also United States v. Broadnax*, 536 F.3d 695, 699 (7th Cir. 2008) ("To eliminate any doubt, we now squarely hold that § 3162(a)(2) requires a defendant to move to dismiss on speedy trial grounds before a trial begins or before a plea is entered.").

Here, the waiver question is complicated by the fact that although O'Connor moved to dismiss prior to trial, as required by the Act, her motion challenged only one exclusion of time: the court's order continuing the case from September 4, 2008, to January 5, 2009. O'Connor's motion preserved this continuance for appellate review, but she challenges several others for the first time on appeal. We have not previously addressed whether a motion to dismiss challenging one Speedy Trial Act exclusion preserves other alleged violations not specifically raised in the motion. Nor, to our

knowledge, has any other circuit directly addressed this question.[3]

The statutory scheme establishing sanctions for exceeding the 70-day limit suggests that the answer to this question is "no." Subsection 3162(a)(2) provides:

> If a defendant is not brought to trial within the time limit required by section 3161(c) as extended by section 3161(h), the information or indictment shall be dismissed on motion of the defendant. The defendant shall have the burden of proof of supporting such motion but the Government shall have the burden of going forward with the evidence in connection with any exclusion of time under subparagraph 3161(h)(3). . . . Failure of the defendant to move for dismissal prior to trial or entry of a plea of guilty or nolo contendere shall constitute a waiver of the right to dismissal under this section.

18 U.S.C. § 3162(a)(2). O'Connor seizes on the last sentence of this subsection and argues that all a defendant must do to preserve appellate review of *any* exclusion of time under the Act is file a motion to dismiss. This argument reads the last sentence of the sanctions provision in isolation.

---

[3] The Second Circuit has suggested, without analysis, that exclusions not specifically challenged in a motion to dismiss are waived. *See United States v. Oberoi*, 547 F.3d 436, 458 (2d Cir. 2008), *vacated & remanded on other grounds,* 130 S. Ct. 1878 (2010).

The last sentence states that the defendant's failure to move to dismiss prior to trial "shall constitute a waiver of the right to dismissal" under the Act. But § 3162(a)(2) also provides that "[t]he defendant shall have the burden of proof of supporting" the motion to dismiss unless the challenged exclusion is one under § 3161(h)(3), which permits the court to continue a case based on the unavailability of the defendant or an essential witness. On a motion to dismiss challenging an exclusion of time under § 3161(h)(3), the government has "the burden of going forward with the evidence." *Id.* § 3161(a)(2). Aside from this sole exception, however, the Act allocates the burden of proving violations to the defendant. As such, the Supreme Court has held that the Speedy Trial Act "assigns the role of spotting violations of the Act to defendants—for the obvious reason that they have the greatest incentive to perform this task." *Zedner*, 547 U.S. at 502-03.

If, as the Court held in *Zedner*, the defendant bears the burden of "spotting" Speedy Trial Act violations, it follows that any specific violation not raised in a motion to dismiss is waived. If filing a motion to dismiss were enough to preserve all violations of the Act— whether identified in the motion or not—then the district court or the government, rather than the defendant, would effectively bear the burden of "spotting violations," contrary to the Court's instruction in *Zedner*. This would upset the statutory scheme. By placing the burden of identifying violations on the defendant, the Act links the right to dismissal with the duty to draw the court's attention to erroneous exclusions of time.

Thus, the text of § 3162(a)(2)—read as a whole and in light of the Court's language in *Zedner*—strongly suggests that violations not specifically identified in the defendant's motion to dismiss are waived, not forfeited.

Having said that, we may reserve ultimate judgment on the waiver-or-forfeiture question for another day; O'Connor's argument fails either way. Even if we assume that her unpreserved challenges were merely forfeited, not waived, none of the claimed violations amounts to plain error. We take them up in chronological order.

### 2. The Continuances

#### The August 22, 2005 and September 2, 2005 orders

O'Connor first challenges two continuances granted early on in the case, on August 22 and September 2, 2005. On August 22 a magistrate judge continued the case to September 2 for preparation of pretrial motions and excluded this delay from the speedy-trial clock. This exclusion was proper under circuit precedent then in effect. In *Tibboel*, 753 F.2d at 610, we held that delays resulting from the preparation of pretrial motions fall within the ambit of § 3161(h)(1)(D), the provision authorizing the automatic exclusion of "delay resulting from any pretrial motion." But the Supreme Court held otherwise in *Bloate*. The pretrial-motion provision specifically permits the court to exclude "delay resulting from any pretrial motion, *from the filing of the motion*

*through the conclusion of the hearing on, or other prompt disposition of, such motion.*" 18 U.S.C. § 3161(h)(1)(D) (emphasis added). *Bloate* held that delays resulting from the *preparation* of pretrial motions are not covered by this provision, which automatically excludes delays from *filing* through *disposition* of motions. 130 S. Ct. at 1353. The Court held that delays attributable to the preparation of pretrial motions *may* be excluded under the ends-of-justice provision, but continuances granted for this purpose must be supported by case-specific findings that the benefits outweigh the costs, as required by § 3161(h)(7). *Id.* at 1352; *see also Zedner*, 547 U.S. at 506-07 (To justify an ends-of-justice continuance, the court must enter the statutorily required findings on the record orally or in writing.).

Here, the magistrate judge did not make the findings *Bloate* requires prior to entering the August 22 exclusion; the exclusion of the 11 days from August 22 to September 2 was therefore error. Assuming this error was plain, however, reversal is unwarranted. Adding 11 days to the speedy-trial clock puts the total at 53 days, still well short of the 70-day limit.

Similarly, on September 2 the district court held a status conference with counsel and continued the case to October 28. In a follow-up minute entry, the court noted that this time was excluded for "motions, trial preparations and plea negotiations," and cited the ends-of-justice provision. The minute entry by itself is brief and does not contain the required statutory findings, but § 3161(h)(7) permits the court to make an oral record of

the reasons for the exclusion, so we may look to the transcript of the status conference. *Zedner*, 547 U.S. at 506-07; *Napadow*, 596 F.3d at 405-06.

There we find a sufficient explanation of the court's reasons for granting this continuance. At the September 2 hearing, one of the defense attorneys noted that he "received four very big boxes of discovery" and needed "a lot more time than the [c]ourt had allowed for discovery motions[,] . . . maybe another 60 days just to get through discovery to figure out what motions [to file]." Another defense lawyer noted that "[t]he Bates numbers [in the discovery documents] run higher than 10,000." The sheer volume of the discovery reflects the complexity of the case, which involved more than 30 separate fraudulent transactions. At the conclusion of the hearing, based on this colloquy with counsel, the judge granted a continuance to October 28 and excluded this time to allow for "motions, preparation, and any plea negotiations." The discussion among counsel and the court reflects the judge's conclusion that this delay was necessary to give the defense lawyers time to understand the government's case, analyze the evidence, and decide what motions might be appropriate and whether their clients' best course was to plead guilty or go to trial. It is precisely for cases like this one that the ends-of-justice provision exists; it offers district judges the flexibility needed to effectively manage complex litigation. *See Zedner*, 547 U.S. at 497. Together, the transcript and the minute order support this ends-of-justice exclusion.

*The January 27, 2006 and May 12, 2006 orders*

O'Connor next challenges an order the district court entered on January 27, 2006, continuing the trial date from May 15, 2006, to July 17, 2006, citing "trial preparation" as the reason and invoking the ends-of-justice provision. This continuance must be read in light of another granted earlier in the case and one that came later. At the court's October 28, 2005 status conference, the defense attorneys told the court they would need several more months to review the voluminous discovery in the case and would not be ready for trial until the spring. With the consent of counsel, the court set a trial date of May 15, 2006, and entered an ends-of-justice exclusion of all time through that date for "continuity of counsel, motions and trial preparations." On January 27, 2006, the court reset the May 15 trial date to July 17, citing trial-preparation needs.

Later, on May 12, 2006, the court adjourned the trial again, this time to January 22, 2007. O'Connor challenges this order as well. Five of the defense attorneys had notified the court that they would be unavailable to try the case on July 17, so the court convened a status conference on May 12 to take up their request for an adjournment. At this conference counsel advised the court that the earliest they would all be available for trial was January 2007. The court expressed concern about the length of the delay but acquiesced and rescheduled the trial for January 22, 2007. The court entered an ends-of-justice exclusion through that date, again citing "trial preparation" and "continuity of counsel" as the reasons for the continuance.

Taking this context into account, we think the court made an adequate record of the reasons for the January 27 and May 12 continuances as required by § 3161(h)(7)(A). The Speedy Trial Act simply requires the court "to put on the record its reasons for finding the continuance warranted[;] . . . it does not require that the court recite the statutory factors or make findings as to each of them on the record." *United States v. Adams*, 625 F.3d 371, 380 (7th Cir. 2010). We have held that "the Speedy Trial Act does not require the court 'to cite . . . sections [of the Act] or to track the statutory language in a lengthy legal opinion,' but rather to make findings 'sufficiently specific to justify a continuance[] and comport with the purposes of the Act.'" *Napadow*, 596 F.3d at 405 (quoting *United States v. Jean*, 25 F.3d 588, 594 (7th Cir. 1994) (alterations in *Napadow*)). It's clear from the transcript of the court's conferences with counsel that these continuances were based on the complexity of the case, the magnitude of the discovery, and the attorneys' schedules. Considered together, the docket entries and the transcript adequately reflect the court's reasons for allowing these two ends-of-justice continuances.

### *The March 24, 2008 and May 1, 2008 orders*

Between 2006 and 2008, many of O'Connor's codefendants pleaded guilty, resulting in additional delays that O'Connor concedes were properly excluded under the Act. The last of her codefendants pleaded guilty on March 8, 2008, and O'Connor's trial was scheduled to begin on March 24, 2008. On that date a dispute arose

over the authentication of mortgage records the government planned to submit as exhibits. Two weeks earlier, the government filed a motion to admit the records under Rule 902(11) of the Federal Rules of Evidence and tendered the required declarations from the records custodians attesting to their authenticity. Just before jury selection was set to begin, O'Connor's counsel objected, raising a challenge to the sufficiency of the declarations (though not the authenticity of the records). The parties jointly requested a continuance to May 19, 2008, to resolve the dispute so that the mortgage records could be admitted without calling records custodians from 22 lending institutions located all over the country. The court granted this request, continued the case to May 19, and entered another ends-of-justice exclusion for "trial preparation." We find no error (much less plain error) in this order. The on-the-record discussion among counsel and the court, together with the court's docket entry, are sufficient to satisfy the requirements of the statute.

On May 1, 2008, the judge notified the parties of a conflict in her schedule that required the court to transfer the case to another judge or reset the May 19 trial. O'Connor's counsel chose the latter option and agreed that the delay could be excluded under the Act. The judge proposed July 1, 2008, as the new trial date. O'Connor's counsel instead suggested a date in September based on other commitments during the summer. The judge reluctantly acquiesced and rescheduled trial for September 22, 2008, entering another ends-of-justice exclusion citing the need for

"continuity of counsel." O'Connor's attorney waived objection to this delay.

O'Connor now argues that the exclusion of time from May 19 to September 22 was improper because the Act does not permit the court to exclude delay resulting from "general congestion of the court's calendar." § 3161(h)(7)(C). The government counters that only 42 days of this delay—from May 19 to July 1—were improperly excluded based on the court's calendar congestion. The court had proposed to start trial on July 1 but counsel was unavailable. Accordingly, the delay from July 1 to September 22 was solely attributable to calendar conflicts of *counsel*, not the court. Indeed, the judge specifically noted the need for continuity of counsel when she set the September 22 date. We agree with the government that only 42 days were improperly excluded from the speedy-trial clock. The rest of the delay was properly excluded and adequately supported by the court's conclusion that the additional time was necessary to maintain continuity of counsel.

### The September 4, 2008 order

We come at last to the only continuance O'Connor preserved for plenary review by specifically citing it as the basis for her motion to dismiss. At a pretrial hearing on September 4, 2008, the government informed the court that Dana Powell, one of its witnesses, would be unable to testify at the September 22 trial. Powell had recently delivered a baby who was very ill and needed to be nursed as many as 13 times a day. Powell was

under doctor's orders to remain at home with the baby and not leave the house except to go to the hospital. The prosecutor informed the court that Powell was one of the straw buyers and was an essential witness for the government, but her medical emergency obviously prevented her from testifying at trial. The court and counsel then discussed when Powell might be available to testify; the court proposed putting the case on the "backup" calendar so that it could be tried before the end of the year. Both the prosecutor and O'Connor's counsel objected to placing the case on the court's "backup" calendar because of the difficulty in assembling witnesses on short notice and the uncertainty of Powell's availability. The judge agreed and continued the trial to January 5, 2009, but instead of docketing the exclusion under § 3161(h)(3), the unavailable essential-witness provision, the court entered a minute order again excluding this time under the ends-of-justice provision "for trial preparation."

Less than a week before trial, O'Connor moved to dismiss, arguing that the September 4 exclusion of time violated the Speedy Trial Act. In response the government submitted a supplemental affidavit offering further evidence that Powell was an essential and unavailable witness. On January 5, 2009, before starting jury selection, the court heard argument and ruled on the motion to dismiss. The judge specifically noted that when the continuance was granted, Powell "had recently had a baby" and that "the baby's health did not allow her to leave." The judge concluded that Powell was a "very important" witness; this conclusion

was based on the government's representations at the September 4 pretrial conference as well as the supplemental affidavit offered in response to the motion to dismiss. The judge also noted that at the September 4 hearing,

> the government represented and we talked about at that hearing why this witness was very important, and the government explained the importance and gave a good explanation, which is supported by the record, as to why this witness was unavailable, that she had recently had a baby, the baby's health did not allow her to leave; and, therefore, that was why I granted the continuance.

Accordingly, the judge clarified that "it was pretty clear . . . from the [September 4] hearing that the reason for continuing the trial was that a witness was both essential and unavailable." The court then entered a specific finding that Powell "was both [an] essential and unavailable" witness and for this reason the delay was "properly excludable" under the unavailable-witness provision of the Act. On that basis the court denied the motion to dismiss.

O'Connor now argues that the court could not enter an ends-of-justice continuance on September 4 and later change course, excluding the time under the unavailable-witness provision when denying the motion to dismiss on January 5. She maintains that the January 5 ruling was an improper retroactive continuance, relying on *United States v. Janik*, 723 F.2d 537, 544-45 (7th Cir. 1983), which suggested in dicta that a judge cannot, in ruling

on a Speedy Trial Act motion to dismiss, retroactively justify a continuance based on reasons not considered at the time the continuance was granted. This argument misconstrues the substance of the September 4 hearing. Although the minute entry states that the continuance was granted "in the interest of justice for trial preparation," the on-the-record colloquy between the court and counsel makes it unmistakably clear that the continuance was granted because Powell was both an essential witness and unavailable because of her newborn's serious illness. Despite the minute entry, which appears to be a technical error, from the very beginning this continuance was based on § 3161(h)(3), the unavailable essential-witness provision, and *not* § 3161(h)(7), the ends-of-justice provision.

The Supreme Court has held that the findings required for an ends-of-justice continuance under § 3161(h)(7) need not be entered into the record contemporaneously with the continuance, but must "be made, if only in the judge's mind, before granting the continuance," and may be recorded later provided they are "put on the record by the time a district court rules on a defendant's motion to dismiss under § 3162(a)(2)." *Zedner*, 547 U.S. at 506-07; *see also Napadow*, 596 F.3d at 405 ("[T]he district court need not explain its findings contemporaneously with its decision to exclude time."); *United States v. Bryant*, 523 F.3d 349, 361 (D.C. Cir. 2008) ("*Zedner* permits trial judges to put their findings on record at the time they rule on a [Speedy Trial Act] motion to dismiss, rather than at the time they grant the continuance . . . ."); *United States v. Larson*, 417 F.3d 741, 746 (7th Cir. 2005)

("Though the district court is not required to make Speedy Trial Act findings contemporaneously with a continuance order, the better practice is for the court to make the required findings at least prior to a defendant's motion to dismiss the indictment for a violation of the Act." (internal citation omitted)).

In contrast to ends-of-justice continuances, however, periods of delay excludable under § 3161(h)(1)-(6) may be *automatically* excluded if the specified conditions are present; no ends-of-justice balancing by the court is necessary because the balance has already been struck by Congress. *United States v. Tinklenberg*, 131 S. Ct. 2007, 2013-15 (2011); *Bloate*, 130 S. Ct. at 1351-52. Here, there is no room for doubt that the September 4 adjournment was necessitated by Powell's unavailability to testify at the September 22 trial based on her baby's illness. Because she was an essential witness, this time was automatically excludable from the speedy-trial clock under § 3161(h)(3); no ends-of-justice findings were necessary.[4] That the judge clarified the basis for the September 4 continuance when she later ruled on the

---

[4] The court's findings that Dana Powell was both essential and unavailable were not clearly erroneous. The record supports the unavailability finding, *see United States v. Koller*, 956 F.2d 1408, 1413 (7th Cir. 1992), and the court's finding that Powell was an essential witness was also correct. O'Connor now argues that Powell's testimony was merely cumulative, but a witness may still be considered essential even if her testimony is not strictly necessary to obtain a conviction. *Cf. United States v. Tedesco*, 726 F.2d 1216, 1222 (7th Cir. 1984) (making this point with an accomplice).

motion to dismiss does not change matters. The court relied on the same rationale at both hearings, which distinguishes this case from *Janik*. Even if we were to treat this as an ends-of-justice continuance (which it was not), no Speedy Trial Act violation occurred. Under *Zedner*, as long as the court's reasons for granting the continuance are placed on the record by the time the court rules on a motion to dismiss, the procedural requirements of the Act are satisfied.

Of course, when granting an ends-of-justice continuance, the "best practice" is for the court "to put its findings on the record at or near the time when it grants the continuance." *Zedner*, 547 U.S. at 507 n.7. The court's statement of reasons need not be lengthy and need not "track the statutory language," but it should be enough to "ensure[] the district court considers the relevant factors and provides this court with an adequate record to review." *Napadow*, 596 F.3d at 405 (quotation marks omitted). Here, however, the continuance was based on an unavailable essential witness, which requires no ends-of-justice reasoning. O'Connor's motion to dismiss was properly denied.

**B.  Sixth Amendment Speedy-Trial Claim**

The Sixth Amendment guarantees an accused "the right to a speedy and public trial." U.S. CONST. amend. VI. Apart from her Speedy Trial Act argument, O'Connor contends that the 1,229-day pretrial delay violated her Sixth Amendment right to a speedy trial. Because O'Connor did not make this argument below, our review

is for plain error. *United States v. Gearhart*, 576 F.3d 459, 462-63 (7th Cir. 2009).

Our rejection of O'Connor's argument under the Speedy Trial Act does not resolve her constitutional claim; while related, the constitutional and statutory rights are distinct. *See id.* at 462 ("The constitutional right to a speedy trial is both narrower and broader than the corresponding statutory right."). Thus, "a violation of one [right] may be found without a violation of the other." *United States v. White*, 443 F.3d 582, 588 (7th Cir. 2006). A Sixth Amendment speedy-trial claim turns on the following general factors: "[W]hether [the] delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result." *Doggett v. United States*, 505 U.S. 647, 651 (1992).

Delays of more than one year are considered presumptively prejudicial, *White*, 443 F.3d at 589-90, and this one obviously qualifies. However, O'Connor bears primary responsibility for many of the pretrial delays and did not suffer actual prejudice. She changed counsel twice during the course of the pretrial proceedings, moved for several continuances, consented to others, and did not assert her speedy-trial rights until the end of December 2008, when she moved to dismiss on Speedy Trial Act grounds several years after her indictment and a week before her trial. Moreover, O'Connor did not seek to sever her case from the other defendants to mitigate delays resulting from the joint prosecu-

tion. Finally, although O'Connor draws our attention to certain government witnesses who had difficulty remembering some facts during cross-examination, these memory lapses were not prejudicial. If anything, they were helpful to O'Connor; she could have highlighted the gaps in their memories as a reason to discount their testimony. The pretrial delay in this case, though lengthy, did not violate the Sixth Amendment.

## C. Jury Instructions

O'Connor next challenges the court's use of a joint-venture instruction. She claims that the instruction constructively amended the indictment by implicitly including an uncharged conspiracy count. She also maintains that the instruction had the effect of easing the government's burden of proof. We need not address the merits of either argument. O'Connor waived any challenge to the joint-venture instruction.

A defendant who specifically approves an instruction in the district court waives the right to challenge it on appeal. *United States v. Griffin*, 493 F.3d 856, 863-64 (7th Cir. 2007) ("Counsel's affirmative statement that he had no objection to the proposed instruction constitutes waiver of the ability to raise this claim on appeal."). Here, O'Connor's counsel stated on the record that he had no objection to the joint-venture instruction. O'Connor attempts to avoid this waiver by casting her appellate argument as a challenge to the jury instructions as a whole rather than a challenge to the joint-venture instruction alone. This argument is nothing more than a rhetorical sleight of hand. O'Connor's claim of instruc-

tional error centers on the joint-venture instruction, which she contends was flawed, given out of context, and corrupted the instructions in their entirety. She does *not* challenge the instructions as a whole but focuses on the joint-venture instruction in particular and its effect on the other instructions. Because O'Connor consented to this instruction, she cannot challenge it on appeal.

## D. Sufficiency of the Evidence

O'Connor also maintains that the evidence was insufficient to support her wire-fraud conviction. Sufficiency-of-the-evidence challenges carry a very steep standard of review; we view the evidence in the light most favorable to the government and reverse only if no rational juror would have found the defendant guilty beyond a reasonable doubt. *United States v. Roberts*, 534 F.3d 560, 569 (7th Cir. 2008). To convict O'Connor of wire fraud under 18 U.S.C. § 1343, the government had to prove that she: (1) participated in a scheme to defraud; (2) had the intent to defraud; and (3) used the wires in furtherance of the fraudulent scheme. *Id.*

O'Connor first claims that because she believed that Cross would make the mortgage payments and never meant to cheat the banks out of money, she lacked intent to defraud. This argument misunderstands the intent element of wire fraud. To win a conviction under § 1343, the government only needed to prove "a willful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for

one's self *or* causing financial loss to another." *Id.* at 571 (emphasis added) (quotation marks omitted). The government did not need to prove that O'Connor intended to harm the banks or cause them to lose money. *United States v. Leahy*, 464 F.3d 773, 786-87 (7th Cir. 2006). The government's evidence established (or so a jury reasonably could believe) that in exchange for $20,000 in side payments from Cross, O'Connor knowingly processed seven fraudulent loan packages and forwarded them on to lenders with the intent that they would provide mortgage funding. This is sufficient to establish intent to defraud.

O'Connor also claims that she was merely an unwitting pawn who lacked substantial education or training and was tricked into participating in Cross's scheme. She points out that she told the FBI that she thought Cross's deals looked clean. She emphasizes as well that she did not graduate from high school and had limited training as a loan officer. She cites *United States v. Bailey*, 859 F.2d 1265, 1273-75 (7th Cir. 1988), which held that proof of knowing participation in a fraudulent scheme requires more than knowledge of "shadowy dealings," superficial participation, or the exchange of money. Unlike in *Bailey*, the evidence establishes that O'Connor was heavily involved in the fraudulent scheme. She knowingly processed and sent to lenders for approval multiple fraudulent mortgage-loan applications falsely representing that persons other than Cross were purchasing the subject properties. She also met with some of the straw buyers and falsely reported on several loan forms that she had personally interviewed the applicants when she had not. Most damning is

O'Connor's acceptance of nearly $20,000 in kickbacks from Cross, a fact she admitted at trial. This quid pro quo—trading her sham approvals of multiple fraudulent loan applications for thousands of dollars in under-the-table payments—is convincing evidence of fraudulent intent.

To be sure, *Bailey* does suggest that proving intent to defraud might be more difficult when the defendant is an unsophisticated low-level participant rather than, for example, a highly educated corporate executive. *See id.* at 1275. But we have cautioned that *Bailey* "do[es] not supply an unsophisticated defendant with an automatic defense to a fraud . . . indictment." *United States v. Johnson*, 927 F.2d 999, 1005 (7th Cir. 1991). This principle is particularly applicable here. The government offered ample evidence of O'Connor's guilt. Accepting her ex-culpatory theory would require us to read the evidence in her favor rather than in favor of the jury's verdict. The evidence was more than sufficient to convict.

### E.  Prejudicial Surplusage in the Indictment

Finally, O'Connor challenges the district court's decision not to redact certain portions of the indictment before sending it to the jury room. At the close of evidence, the parties disagreed over the form of the indictment the court would provide to the jury. The caption of the indictment identified O'Connor's codefendants, and she asked the court to redact their names as prejudicial surplusage. The government objected to removing the codefendants' names because the jury might speculate

about why the key participants in the scheme—whose involvement had been the subject of much of the trial testimony—were not included as defendants in the caption. The judge denied O'Connor's request and let the unredacted form of the indictment go to the jury. The judge did, however, issue a cautionary instruction telling the jurors not to "speculate [about] why any other person whose names you may have heard during the trial or who was named in the indictment in this case as a defendant is not currently on trial before you."

The Federal Rules of Criminal Procedure provide that "[u]pon the defendant's motion, the court may strike surplusage from the indictment or information." FED. R. CRIM. P. 7(d). The court's decision on a Rule 7(d) motion turns on considerations of relevance and prejudice. *United States v. Peters*, 435 F.3d 746, 753 (7th Cir. 2006) ("Surplusage should not be stricken unless it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial." (quotation marks omitted)). We review the denial of a Rule 7(d) motion to strike for abuse of discretion. *United States v. Terrigno*, 838 F.2d 371, 373 (9th Cir. 1988).

We find no abuse of discretion here. The identity of the codefendants was relevant to the charge against O'Connor. Their names had been repeated often during the trial, and this information was important to provide the jury with a more complete picture of the scheme. The link between O'Connor and her codefendants was central to the case, so leaving their names in the indictment's caption caused no prejudice. Finally, the court issued a cautionary instruction warning the jury that

the indictment was not evidence and that O'Connor's association with her codefendants was not sufficient by itself to prove her knowing participation in the scheme. *See United States v. Marshall*, 985 F.2d 901, 906 (7th Cir. 1993) (cautionary instructions can mitigate the risk of prejudice).

O'Connor raises two additional Rule 7(d) arguments for the first time on appeal, both unavailing. She claims that a paragraph in the indictment referring to the total loss caused by the fraudulent scheme was prejudicial surplusage. We disagree. The amount of the fraud was relevant and had been placed in evidence during the trial. The evidence of the loss amount—about $6 million— approximated the $6.2 million loss alleged in the indictment. O'Connor's final argument is that some parts of the indictment described facts that pertained only to the involvement of others in the scheme but erroneously and prejudicially implied her participation. But the wire-fraud count against her incorporated by reference the entire fraudulent scheme. Accordingly, the parts of the indictment she claims were irrelevant were actually included in the charge against her. The form of the indictment that went to the jury did not contain irrelevant and prejudicial surplusage.

AFFIRMED.